UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARNELLE C. M.,[1] <br><br> Plaintiff, <br><br> v. <br><br> ANDREW SAUL, Commissioner of Social Security Administration, <br><br> Defendant. | Case No. 5:20-cv-01119-JC <br><br> MEMORANDUM OPINION AND ORDER OF REMAND |

## I. SUMMARY

On June 1, 2020, plaintiff Darnelle C. M. filed a Complaint seeking review of the Commissioner of Social Security's denial of plaintiff's application for benefits. The parties have consented to proceed before the undersigned United States Magistrate Judge.

This matter is before the Court on the parties' cross motions for summary judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion") (collectively "Motions"). The Court has taken the Motions under submission

---

[1] Plaintiff's name is partially redacted to protect her privacy in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

without oral argument. See Fed. R. Civ. P. 78; L.R. 7-15; Order Lifting Stay; Case Management Order filed on December 9, 2020, at ¶ 3.

Based on the record as a whole and the applicable law, the decision of the Commissioner is REVERSED AND REMANDED for further proceedings consistent with this Memorandum Opinion and Order of Remand. In this case, the Administrative Law Judge ("ALJ") materially erred by rejecting plaintiff's subjective symptom testimony without providing adequate reasons.

## II. BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

On October 5, 2017, plaintiff filed an application for Disability Insurance Benefits, alleging disability beginning on October 22, 2016, due to osteoporosis and herniated discs. (Administrative Record ("AR") 148-49, 161). The ALJ subsequently examined the medical record and heard testimony from plaintiff (who was represented by counsel) and a vocational expert. (AR 28-52).

On August 29, 2019, the ALJ determined that plaintiff was not disabled through the date of the decision. (AR 15-23). Specifically, the ALJ found: (1) plaintiff suffered from the following severe impairments: osteoarthritis, osteoporosis, degenerative disc disease of the lumbar spine, and lateral tibial fracture (AR 17); (2) plaintiff's impairments, considered individually or in combination, did not meet or medically equal a listed impairment (AR 18); (3) plaintiff retained the residual functional capacity to perform light work (20 C.F.R. §§ 404.1567(b)), with additional limitations[2] (AR 18-22 (adopting capacity consistent with orthopedic consultative examiner's opinion at AR 408-14)); (4) plaintiff could perform her past relevant work as a director of ministries and therefore was not disabled (AR 22-23 (adopting vocational expert testimony at AR

---

[2]The ALJ determined that plaintiff would be limited to frequent bending, crouching, kneeling, crawling, stooping, climbing, balancing, walking on uneven terrain, and working at heights. (AR 18).

2

47-48)); and (5) plaintiff's statements regarding the intensity, persistence, and limiting effects of subjective symptoms were not entirely consistent with the medical evidence and other evidence in the record (AR 19-21).

On May 14, 2020, the Appeals Council denied plaintiff's application for review. (AR 1-3).

## III. APPLICABLE LEGAL STANDARDS

### A. Administrative Evaluation of Disability Claims

To qualify for disability benefits, a claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012) (quoting 42 U.S.C. § 423(d)(1)(A)) (internal quotation marks omitted), superseded by regulation on other grounds; 20 C.F.R. §§ 404.1505(a), 416.905. To be considered disabled, a claimant must have an impairment of such severity that she is incapable of performing work the claimant previously performed ("past relevant work") as well as any other "work which exists in the national economy." Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)).

To assess whether a claimant is disabled, an ALJ is required to use the five-step sequential evaluation process set forth in Social Security regulations. See Stout v. Comm'r, Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006) (describing five-step sequential evaluation process) (citing 20 C.F.R. §§ 404.1520, 416.920). The claimant has the burden of proof at steps one through four – i.e., determination of whether the claimant was engaging in substantial gainful activity (step 1), has a sufficiently severe impairment (step 2), has an impairment or combination of impairments that meets or medically equals one of the conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings") (step 3), and retains the residual functional capacity to perform past relevant work (step 4).

3

Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted). The Commissioner has the burden of proof at step five – *i.e.*, establishing that the claimant could perform other work in the national economy. Id. "If the ALJ determines that a claimant is either disabled or not disabled at any step in the process, the ALJ does not continue on to the next step." Bray v. Commissioner of Social Security Administration, 554 F.3d 1219, 1226 (9th Cir. 2009) (citing 20 C.F.R. § 416.920(a)(4)).

### B. Federal Court Review of Social Security Disability Decisions

A federal court may set aside a denial of benefits only when the Commissioner's "final decision" was "based on legal error or not supported by substantial evidence in the record." 42 U.S.C. § 405(g); Trevizo v. Berryhill, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted). The standard of review in disability cases is "highly deferential." Rounds v. Comm'r of Soc. Sec. Admin., 807 F.3d 996, 1002 (9th Cir. 2015) (citation and quotation marks omitted). Thus, an ALJ's decision must be upheld if the evidence could reasonably support either affirming or reversing the decision. Trevizo, 871 F.3d at 674-75 (citations omitted). Even when an ALJ's decision contains error, it must be affirmed if the error was harmless. See Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014) (ALJ error harmless if (1) inconsequential to the ultimate nondisability determination; or (2) ALJ's path may reasonably be discerned despite the error) (citation and quotation marks omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Trevizo, 871 F.3d at 674 (defining "substantial evidence" as "more than a mere scintilla, but less than a preponderance") (citation and quotation marks omitted). When determining whether substantial evidence supports an ALJ's finding, a court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence
///

that detracts from the Commissioner's conclusion[.]" Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (citation and quotation marks omitted).

Federal courts review only the reasoning the ALJ provided, and may not affirm the ALJ's decision "on a ground upon which [the ALJ] did not rely." Trevizo, 871 F.3d at 675 (citations omitted). Hence, while an ALJ's decision need not be drafted with "ideal clarity," it must, at a minimum, set forth the ALJ's reasoning "in a way that allows for meaningful review." Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015) (citing Treichler, 775 F.3d at 1099).

A reviewing court may not conclude that an error was harmless based on independent findings gleaned from the administrative record. Brown-Hunter, 806 F.3d at 492 (citations omitted). When a reviewing court cannot confidently conclude that an error was harmless, a remand for additional investigation or explanation is generally appropriate. See Marsh v. Colvin, 792 F.3d 1170, 1173 (9th Cir. 2015) (citations omitted).

## IV. DISCUSSION

Plaintiff claims that the ALJ erred by improperly rejecting her subjective symptom testimony. (Plaintiff's Motion at 3-8). For the reasons stated below, the Court agrees. Since the Court cannot find that the error was harmless, a remand is warranted.

### A. Pertinent Law

When determining disability, an ALJ is required to consider a claimant's impairment-related pain and other subjective symptoms at each step of the sequential evaluation process. 20 C.F.R. §§ 404.1529(a), 404.1529(d), 416.929(a), 416.929(d). Accordingly, when a claimant presents "objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms [the claimant] alleged," the ALJ is required to determine the extent to which the claimant's statements regarding the intensity, persistence, and limiting effects of her subjective symptoms ("subjective statements" or "subjective

5

complaints") are consistent with the record evidence as a whole and, consequently, whether any of the individual's symptom-related functional limitations and restrictions are likely to reduce the claimant's capacity to perform work-related activities. 20 C.F.R. §§ 404.1529(a), 404.1529(c)(4), 416.929(a), 416.929(c)(4); SSR 16-3p, 2017 WL 5180304, at *4-*10.[3] When an individual's subjective statements are inconsistent with other evidence in the record, an ALJ may give less weight to such statements and, in turn, find that the individual's symptoms are less likely to reduce the claimant's capacity to perform work-related activities. See SSR 16-3p, 2017 WL 5180304, at *8. In such cases, when there is no affirmative finding of malingering, an ALJ may "reject" or give less weight to the individual's subjective statements "only by providing specific, clear, and convincing reasons for doing so." Brown-Hunter, 806 F.3d at 488-89. This requirement is very difficult to satisfy. See Trevizo, 871 F.3d at 678 ("The clear and convincing standard is the most demanding required in Social Security cases.") (citation and quotation marks omitted).

An ALJ's decision "must contain specific reasons" supported by substantial evidence in the record for giving less weight to a claimant's statements. SSR 16-3p, 2017 WL 5180304, at *10. An ALJ must clearly identify each subjective statement being rejected and the particular evidence in the record which purportedly undermines the statement. Treichler, 775 F.3d at 1103 (citation omitted). Unless there is affirmative evidence of malingering, the Commissioner's reasons for rejecting a claimant's testimony must be "clear and convincing." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995) (internal quotation marks

---

[3]Social Security Ruling 16-3p superseded SSR 96-7p and, in part, eliminated use of the term "credibility" from SSA "sub-regulatory policy[]" in order to "clarify that subjective symptom evaluation is not an examination of an individual's [overall character or truthfulness] . . . [and] more closely follow [SSA] regulatory language regarding symptom evaluation." See SSR 16-3p, 2017 WL 5180304, at *1-*2, *10-*11.

omitted), as amended (Apr. 9, 1996).  "General findings are insufficient[.]" Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (citations omitted).

If an ALJ's evaluation of a claimant's statements is reasonable and is supported by substantial evidence, it is not the court's role to second-guess it.  See Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).  When an ALJ fails properly to discuss a claimant's subjective complaints, however, the error may not be considered harmless "unless [the Court] can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  Stout, 454 F.3d at 1056; see also Brown-Hunter, 806 F.3d at 492 (ALJ's erroneous failure to specify reasons for rejecting claimant testimony "will usually not be harmless").

### B. Summary of the Relevant Medical Record

Plaintiff presented to Dignity Health Urgent Care in August of 2016, complaining of sharp, right-sided low back pain radiating to the buttock for two weeks with no reported trauma.  (AR 433).  She was diagnosed with acute back pain with sciatica and sent home with a prescription for Naproxen.  (AR 434-35). She returned later in August, reporting worsening back pain radiating down the left leg with numbness, for which she was diagnosed with acute lumbar back pain and lumbar spine strain and prescribed Baclofen and Voltaren topical gel.  (AR 436-38).

Plaintiff attended physical therapy at Marketplace Physical Therapy from September through November of 2016.  (AR 259-300).  She reported sciatic nerve pain and spinal arthritis, rating her pain ranging from 3/10 to 10/10 with her pain at 9/10 initially.  (AR 263, 265).  Plaintiff also initially reported that she got little relief from her pain medication, could not lift heavy weights, could not walk more than 1/4 of a mile, could not sit more than one hour, could stand as long as she wanted but with pain, and that pain prohibits her from doing anything more than

///

light duties. (AR 267). Her therapist reported "steady progress with each passing day" with acute pain reducing to sub-acute pain in October of 2016. (AR 285).

Plaintiff presented to the McKee Family Health Center in October of 2016, for test results and a medication refill for Hydrocodone, Naproxen, and Gabapentin, reporting tinnitus and back pain radiating to her legs rated at 5/10. (AR 236-38). She reported that her sciatica was getting better and that she did not take her pain medication during the day because she then was caring for three to five children and could not be drowsy. (AR 237). She also reported taking less Gabapentin because it was making her tired. (AR 237). Plaintiff stopped working at the end of October. (AR 38).

Plaintiff treated with Dr. Richard M. Kangah from February of 2017 through at least April of 2018. (AR 305-47, 385-99, 416-31). At her initial visit, plaintiff reported having low back pain for six months and complained of muscle cramps and, despite reportedly no abnormal findings on examination (with no detail), was assessed with "active diagnoses" for low back pain and intervertebral disc degeneration in her lumbar spine and prescribed Norco. (AR 312-14). When she returned in March of 2017, plaintiff reportedly denied any musculoskeletal issues. (AR 306). She was still taking only extra strength Tylenol. (AR 306). Although again there were no abnormal findings reported on examination, Dr. Kangah noted plaintiff had a history of low back pain and prescribed Norco. (AR 307-11). Plaintiff filled her Norco prescription in April of 2017. (AR 326).

At her April, 2017 visit, it is noted that plaintiff reported she exercised on a regular basis and had a recent increase in her physical activity with her reportedly in good physical condition. (AR 327). The record does not contain any detail about what exercise plaintiff may have been doing. Plaintiff complained of muscle aches, back pain, cramps, sciatica, and tenderness of the lower back with straight leg raising, but no weakness or difficulty walking. (AR 327). She had no reported
///

abnormalities on examination. (AR 328). She reportedly was tolerating her medication well without adverse effects. (AR 328).

A MRI of plaintiff's lumbar spine dated May 5, 2017, notedly was a limited evaluation secondary to motion artifact with recommended repeat MRI. (AR 302-03). The MRI did show subacute injury at the superior endplate of the L2 vertebral body with a Schmorl's node, and a 3-mm disc bulge at L4-L5 with mild neural foraminal narrowing, bilateral facet joint arthritis, and encroachment on the bilateral transiting nerve roots. (AR 303).

At her May and June, 2017 visits with Dr. Kangah, it is noted that plaintiff reported no back pain or difficulty walking, and her examination results reportedly were normal. (AR 331-32, 334-35). Her Norco was refilled. (AR 332, 335, 337). Dr. Kangah reviewed plaintiff's lumbar spine MRI and referred plaintiff to an orthopedic surgeon. (AR 337).

Plaintiff presented to Dr. Scott R. Strum of Arrowhead Orthopedics in July and August of 2017 for an evaluation of her constant, worsening low back pain radiating to her legs with numbness and tingling. (AR 361-72). Plaintiff reportedly believed her condition was <u>not</u> severe enough to consider surgery and was relieved 50 percent by pain medication. (AR 361-62). She reportedly had gotten no relief from physical therapy and a steroid injection. (AR 361-62). On examination, she notedly had somewhat exaggerated lumbar lordosis, limited range of motion in all planes, tenderness to palpation at L2 and L3, some difficulty transferring from chair to standing and from standing to the examination table, but no atrophy and a normal gait. (AR 363, 368-69). Her May, 2017 MRI reportedly demonstrated possible L2 chronic compression fracture and demonstrated mild multilevel disc bulging without significant neural compression. (AR 364). Dr. Strum assessed with a L2 compression fracture, back pain, and likely osteoporosis, and referred plaintiff to an osteoporosis specialist. (AR 364). Based on her MRI study, Dr. Strum opined there was no surgery that could be performed to improve

her symptoms, so she was referred for pain management for possible injections. (AR 369).

When plaintiff returned to Dr. Kangah in July of 2017, she reported that Dr. Strum had discovered a back "fx" (fracture), but Dr. Kangah's office had not received any documentation which Dr. Kangah subsequently requested. (AR 340-41). In August of 2017, plaintiff returned to renew her medications and was noted to also have osteoporosis for which she was prescribed Fosamax. (AR 342-44; see also AR 351-54 (July, 2017 bone density study reporting low densities)).

Plaintiff returned to Dr. Kangah in September of 2017, for a medication refill. (AR 393-95). Plaintiff was noted to have a fracture due to osteoporosis at L4-L5, with current complaints of myelopathy with numbness and tingling in her legs. (AR 395). Plaintiff reportedly wanted disability and was told to fill out forms for Dr. Kangah to sign. (AR 395). There are no such forms in the record.

The next available treatment note is from April of 2018, when plaintiff returned to Dr. Kangah for her hearing (tinnitus) and reportedly refused to have a physical done. (AR 425). She notedly had limited range of motion in her low back and degeneration of her intervertebral disc(s). (AR 426). Her Norco was continued. (AR 427).

Plaintiff returned to Dignity Health Urgent Care in May of 2018, reporting rib-trunk pain and rib-trunk swelling for four days, which occurred when plaintiff "leaned over" and hurt her rib. (AR 439). She was given a shot of Toradol and prescribed Tramadol. (AR 440-42). She returned in August of 2018, for a left knee injury causing pain and swelling, for which she was prescribed Naproxen. (AR 443-46).

Plaintiff presented to Beaver Medical Group in November of 2018 to establish care for her chronic back, knee, and arm pain which she medicated with Norco. (AR 447). She had fallen three months earlier and injured her knees. (AR 447). She reported increasing back pain since August of 2016. (AR 447). On

examination, she had lumbar tenderness, degenerative changes in both knees with some swelling and crepitus, and tenderness in the right lateral humeral epicondyle (AR 448). She was diagnosed with bilateral knee pain, osteoporosis, back pain, and tendinitis, knee x-rays were ordered (see AR 455-57 (x-rays showing no acute findings, degenerative changes, and mild irregularity in the left knee which could be related to previous minimally depressed tibial plateau fracture)), and her Naprosyn was refilled to go with her other medications (Norco and Tizanidine). (AR 448-49). When she returned in January of 2019, some of her medical records were reviewed and her medications were continued. (AR 459-63).

Meanwhile, consultative examiner Dr. Jeff Altman prepared an Orthopedic Consultation dated February 12, 2018. (AR 408-14). Plaintiff complained of osteoporosis with a spine fracture for which she had felt symptoms since August of 2016. (AR 408). She complained of sharp, aching back pain radiating into her lower extremities, which worsened with sitting for 30 minutes. (AR 408). Plaintiff had undergone physical therapy which she reported made her symptoms worse, and was using a TENS unit, doing yoga and stretching. (AR 409). Dr. Altman reviewed the medical record which included lumbar spine x-rays from August of 2016, showing degenerative changes (see AR 429), the May, 2017 lumbar spine MRI (see AR 430-31), the bone scan report (see AR 351-54), and a note from Arrowhead Orthopedics concerning a possible L2 compression fracture. (AR 409). Plaintiff's examination findings reportedly were within normal limits. (AR 410-13). Dr. Altman did not order any new imaging studies, and diagnosed lumbar disc disease at L4-L5 with a 3-mm disc bulge as shown in the MRI, questionable compression fracture per the medical record, and osteoporosis. (AR 413). Dr. Altman opined that Plaintiff was capable of light work with frequent postural activities consistent with the ALJ's residual functional capacity determination. (AR 413-14).

///

A state agency physician had reviewed the record in December of 2017 and opined that an orthopedic consultative examination was needed. (AR 53-58). In March of 2018, after Dr. Altman's evaluation, the state agency physician reviewed the record and opined that plaintiff was capable of medium work, finding that the Dr. Altman's opinion appeared to be "overly restrictive" based on the physical findings. (AR 60-63). On reconsideration in April of 2018, another state agency physician found plaintiff capable of medium work. (AR 66-77).

**C. Plaintiff's Subjective Statements**

Plaintiff's past relevant work was as a director of ministries (Dictionary of Occupational Titles 169.167-034), light work, which reportedly is like an office manager. (AR 33). Plaintiff testified that she last worked in October of 2016 at a preschool and stopped working due to pain and stress. (AR 38). Plaintiff said when she was working for the ministry, she had an injury that "greatly handicapped" her – *i.e.*, she was on a lot of pain medication and could not concentrate to deal with people or go to the office every day to work. (AR 39). Plaintiff was still taking those pain medications at the time of the hearing. (AR 39).[4]

Plaintiff testified that her medications "mitigate" her pain but she has good and bad days when her spine feels like a wood beam. (AR 42). Plaintiff also said that she never sleeps more than four hours a night due to pain and she has tinnitus 24/7, which affects everything else and makes her a "ball of anxiety." (AR 42).

When asked if anyone had told her why she was having so much pain, plaintiff said that she had lost three inches in height in less than three years, could not bend over to clip her toenails or put on pants, had fallen off her stairs so she lives downstairs in her house where, on a good day, she could take one trip

---

[4]As detailed above, plaintiff was taking, *inter alia*, Gabapentin, Hydrocodone, Methylprednisolone, Naproxen and Tizanidine for her pain and numbness. (AR 164, 188).

12

upstairs, and on a bad day when her back "feels like a wood beam," she does not go anywhere in her house. (AR 40).

The ALJ countered that the diagnostic studies "don't show much," and again asked if plaintiff was told what is causing her pain and plaintiff replied, "I've been told well, your spine collapsed. . . it didn't heal right." (AR 40). Plaintiff had asked her doctor why she was continuing to lose height and have limitations and said she was told it was because she has a disease and is losing bone density at an accelerated rate. (AR 41; see also AR 188 (plaintiff discussing same and describing a "fractured spine" which caused her spine to collapse and osteoporosis)).

Consistent with the medical record, plaintiff said she was referred by her orthopedic surgeon to the pain clinic where she was told that she has osteoporosis and nothing could be done for her by surgery. (AR 44). She explained that her issues started when she got sick and was in bed with strep throat and developed pain in her back and numbness in her legs that made her barely able to walk. (AR 46). Plaintiff had been given pain injections and medications and physical therapy which made her pain worse. (AR 46). Plaintiff had only had one MRI study and no nerve conduction testing. (AR 47).

Plaintiff lived with her husband and three teenage grandchildren who she described as her "workers in the home." (AR 42). Plaintiff said she spent her days listening to news, reading, sitting, lying down and napping, taking her youngest grandson to school which was seven minutes away. (AR 43). She said sometimes she will put food in the oven but her grandchildren take care of everything. (AR 43). She said she could not go to her grandson's athletic events because sitting for three hours is extremely uncomfortable and painful. (AR 44).[5]

---

[5]In an Exertion Questionnaire dated October 17, 2017, plaintiff reported: (1) she did not walk more than 50 feet (or for 15-20 minutes) and did so slowly with a limp due to pain; (2) she
(continued...)

13

Plaintiff's counsel argued at the hearing that if plaintiff's pain were accounted for it would preclude her past relevant work which would render her presumptively disabled under "the Grids," 20 C.F.R. Part 404, Subpart P, Appendix 2 (AR 50). Plaintiff had reported that she became unable to do her director of ministries job because it required at least five or six hours of sitting per day, when she could barely sit for 30 minutes before needing to lie down, and due to anxiety and stress. (AR 195).[6]

**D. Analysis**

The ALJ determined that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e] decision." (AR 19). However, the ALJ failed to provide specific, clear, and convincing reasons to support this determination.

---

[5](...continued) stopped climbing stairs because it was painful and she had fallen; (3) she shopped for and lifted groceries and laundry (less than five pounds) two to three times per week; (4) she did not clean her home or do yard work but could drive a car and had considerable pain if she drove for more than 20 minutes (but see AR 188 (plaintiff explaining that she could do very light cleaning like washing dishes and cooking for her grandchildren)); (5) she napped one or two hours a day; (6) she could sit for no more than 30 minutes at a time; (7) she could not bend over and cut her toenails or put on socks, shoes or pants; and (8) her daily medications left her feeling unbalanced, weak, and fatigued, which affected her concentration. (AR 185-89). Plaintiff explained that her limited ability to bend over or and to sit/stand for only a short amount of time greatly limited her normal activities. (AR 187). She assertedly was unable to finish tasks after 15 minutes of exertion due to pain, fatigue and limb numbness. (AR 187).

[6]The vocational expert testified that a person with the residual functional capacity the ALJ found to exist could perform plaintiff's past relevant work. (AR 47-48; compare AR 194-95 (plaintiff's description of her past relevant work)). However, the vocational expert further opined that if the person was further limited to performing simple, repetitive, routine tasks, or to non-complex tasks and only superficial interpersonal interactions, that person could not perform plaintiff's past relevant work. (AR 48-49).

The ALJ explained that despite plaintiff's allegations of pain and limited functioning, "the medical findings in the record revealed largely unremarkable findings and symptoms that improved or were otherwise reasonably controlled with conservative treatment modalities." (AR 19 (erroneously referring to plaintiff's allegations as "his allegations")). The ALJ went on to discuss the medical evidence, noting, *inter alia*, that plaintiff's physical examinations "revealed negative or at most, unremarkable findings as to her gait, musculoskeletal functioning, or any bony abnormalities." (AR 19-21).[7]

A purported lack of objective medical evidence is not – in and of itself – a sufficient basis to discount a claimant's testimony, but may be a relevant factor. See, e.g., Burch, 400 F.3d at 681 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis."). Even so, the ALJ did not specify or explain how any of plaintiff's medical evidence undermined or contradicted her statements. The ALJ instead simply referenced plaintiff's examination findings and found that the residual functional capacity assessment reasonably accounted for plaintiff's impairments. (AR 20-21). The ALJ failed to demonstrate how these findings support the rejection of plaintiff's statements – including, among other things, her statements that her pain interfered with her ability to concentrate and interact with others, and that she was unable to sit for more than 30 minutes at a time before needing to lie down due to pain. See Lambert v. Saul, 980 F.3d 1266,

---

[7] Plaintiff's counsel had questioned how well Dr. Kangah had documented plaintiff's complaints – arguing that Dr. Kangah's treatment notes had reported completely normal results until plaintiff went to the orthopedist Dr. Strum. (AR 45). As summarized above, Dr. Kangah's notes do report few complaints and normal findings on examination despite prescribing strong narcotic medication. Whereas, Dr. Strum detailed plaintiff's subjective complaints of constant worsening low back pain radiating to her legs with numbness and tingling, and her abnormal findings on examination (*i.e.*, tenderness to palpation at L2 and L3, some difficulty transferring from chair to standing and from standing to the examination table). See AR 363, 368-69 (Dr. Strum's notes).

15

1278 (9th Cir. 2020) ("Although the ALJ did provide a relatively detailed overview of [plaintiff's] medical history, 'providing a summary of medical evidence . . . is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible.") (quoting Brown-Hunter, 806 F.3d at 494); see also id. at 1268 ("[T]he ALJ must identify the specific testimony that he discredited and explain the evidence undermining it.").

Defendant points out that the ALJ also referenced plaintiff's asserted "conservative treatment modalities" as reasonably controlling plaintiff's pain, and also relied on the findings of the consultative examiner to negate plaintiff's pain testimony. See Defendant's Motion at 6-7 (referencing AR 19-21). To the extent the ALJ relied on the consultative examiner's opinion to discount plaintiff's subjective statements, said opinion is just a part of the medical record which cannot form the sole basis for discounting subjective complaints, and it does not explain a basis to discount plaintiff's pain complaints.

To the extent the ALJ relied on plaintiff's assertedly conservative treatment modalities in discounting her statements, an ALJ may give less weight to a claimant's subjective complaints to the extent the claimant was adequately treated with conservative measures. See Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (evidence that claimant "responded favorably to conservative treatment" inconsistent with plaintiff's reports of disabling pain); Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citation omitted), cert. denied, 552 U.S. 1141 (2008); SSR 16-3p, 2016 WL 1119029, at *7-*8 (ALJ may give less weight to subjective statements where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints. . . ."); SSR 96-7p, 1996 WL 374186, at *7 (a "[claimant's] statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints. . .").

Here, however, plaintiff treated with narcotic pain medications and it is doubtful whether ongoing treatment with Tramadol and Hydrocodone (Norco) may properly be characterized as "conservative" within the meaning of Ninth Circuit jurisprudence, especially since plaintiff's orthopedic surgeon indicated that surgery is not an option and her condition must be addressed through pain management. See AR 369; see also, e.g., Shepard v. Colvin, 2015 WL 9490094, at *7 (E.D. Cal. Dec. 30, 2015) ("[p]rior cases in the Ninth Circuit have found that treatment was conservative when the claimant's pain was adequately treated with over-the-counter medication and other minimal treatment," however where record reflected heavy reliance on Tramadol and Oxycodone and other prescriptions for pain, record did not support finding that treatment was "conservative") (internal citations omitted; citing for comparison Lapeirre-Gutt v. Astrue, 382 Fed. App'x. 662, 664 (9th Cir. 2010) (doubting whether "copious amounts of narcotic pain medication" as well as nerve blocks and trigger point injections was "conservative" treatment)); Childress v. Colvin, 2014 WL 4629593, at *12 (N.D. Cal. Sept. 16, 2014) ("[i]t is not obvious whether the consistent use of [Norco] (for several years) is 'conservative' or in conflict with Plaintiff's pain testimony"); Aguilar v. Colvin, 2014 WL 3557308, at *8 (C.D. Cal. July 18, 2014) ("It would be difficult to fault Plaintiff for overly conservative treatment when he has been prescribed strong narcotic pain medications"); Christie v. Astrue, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to characterize as "conservative" treatment that included narcotic pain medication and epidural injections).

Because the ALJ failed to provide specific, clear, and convincing reasons to discount plaintiff's subjective statements, remand is warranted for reconsideration of these statements. See Treichler, 775 F.3d at 1103 ("Because 'the agency's path' cannot 'reasonably be discerned,' we must reverse the district court's decision to the extent it affirmed the ALJ's credibility determination.") (quoting Alaska Dep't of Env't Conserv. v. E.P.A., 540 U.S. 461, 497 (2004)).

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner of Social Security is REVERSED in part, and this matter is REMANDED for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: April 28, 2021

               /s/
               Honorable Jacqueline Chooljian
               UNITED STATES MAGISTRATE JUDGE